## MAYNARD v. JOHNSON, Upon Re-hearing.

In cases of doubtful construction, the debates of a Legislative body may be resorted to, to determine the meaning of a law. But this only in cases where the language of the law is so ambiguous as not clearly to show the meaning intended to be conveyed.

In interpreting doubtful statutes, the primary object is to ascertain the intent of the Legislature.

This intent is to be gathered, first, from the language of the statute, next from the mischiefs intended to be suppressed, or benefits to be attained.

If one clause of a statute is ambiguous, the whole Act is to be examined to explain or remove that ambiguity.

Considering the form in which the 158th section of the Stamp Act passed the Lower House of Congress; the amendment and proviso added thereto in the Senate; the effect which that amendment was admitted to have, both by its friends and opponents; the subsequent amendments of the law by an Act which gives a legislative interpretation to that section; and the general object and intention of the law—it seems more reasonable to construe the terms "such instrument" in the latter part of that section as referring to all

3

unstamped instruments, rather than as being confined to those which were left unstamped with a fraudulent intent to evade the revenue.

The former opinion of this Court on this point is held erroneous, and it is held that notes issued under the Act of June 3d, 1864, not properly stamped, were void.

Opinion upon re-hearing, by BROSNAN, J., full Bench concurring.

A re-hearing was granted in this case, because the Court was not entirely satisfied as to the correctness of its former decision. We hoped that on a re-argument some more convincing reasons might be presented, calculated either to confirm the opinion heretofore expressed, or enable us to reach some other satisfactory conclusion.

The only question involved is one of statutory construction, arising out of the Act of Congress entitled " An Act to provide Internal Revenue to support the Government to pay interest on the Public Debt," etc., etc., approved June 30th, 1864.

The only point particularly urged on the re-hearing by the respondent was, that the debates in the Senate of the United States upon the passage of the Act showed clearly that the Senators gave to the law an interpretation different from that placed on it by this Court. And it must be confessed that so far as the intention of the Senate is to be gathered from the debates in that body, the respondent has successfully established his proposition. In case of doubt, and also where a statute will bear opposite meanings, either from inaptness of phraseology or an ungrammatical collocation of its several clauses, it is very usual to resort to the discussions of the legislators on the disputed point, with a view to the ascertainment of their intention. This is authorized and legitimate both in the interpretation of statutes and constitutions. Nevertheless, we think that Courts are not accustomed to give controlling weight to the views of legislators expressed in debate upon the point under discussion. Most certainly not whenever the language of the statute is so clear and explicit as that a fair, rational, and pertinent meaning can be derived from the terms used. It is not denied that the intention of the law-makers is first to be sought, but that is to be spelled out from the words they employ as the medium to express and convey their meaning. And although it be established doctrine at the present day that the right and duty to expound

doubtful and ambiguous provisions of statutes devolve upon the judiciary, yet so important a subject is not committed to the arbitrary discretion of Courts or Judges.   There are certain established rules of interpretation by which Courts are governed.   We will apply some of these to the discovery of the fact or truth which we aim to grasp in the case under consideration.

When a statute is of a doubtful meaning, the first thing is to ascertain the intention of the Legislature that framed the Act; next, the course to be pursued to compass that result.

The intention of the Legislature must be found, if possible, within the statute itself—that is, in the words which the Legislature has employed.   Outside of the statute, we are to consider the mischiefs it was intended to suppress ; or, as the case may be, the object or benefits to be thereby attained.

Another well-settled rule is, that where a cause of doubt exists, although it attaches only to a particular word or clause, the whole statute is to be taken together, and so examined as to arrive at the intent, if possible.

With these rules in view, we proceed to inquire into the object of the statute under examination, and whether it does not contain within its terms and parts intrinsic and satisfactory evidence of the intention of the framers of the law.

The question of doubt arises on the construction of the 158th section of the Act, which reads :

" That any person or persons who shall make, sign, or issue, or who shall cause to be made, signed, or issued, any instrument, document, or paper of any kind or description whatsoever, or shall accept or pay, or cause to be accepted or paid, any bill of exchange, draft, or order, or promissory note, for the payment of money, without the same being duly stamped, or having thereupon an adhesive stamp for denoting the duty chargeable thereon, with intent to evade the provisions of this Act, shall, for every such offense, forfeit the sum of two hundred dollars."

In this shape the section passed the House.   In the Senate, Mr. Fessenden proposed to add the following amendment to it :

" And such instrument, document or paper, bill, draft, order, or note shall be deemed invalid, and of no effect."

In the discussion that arose upon this amendment it was assumed,

rather expressly conceded, by all the Senators who spoke to the question, that the effect of the amendment would be to make void all instruments requiring a stamp that were not stamped when executed. This fact or result, we say, was conceded by all the Senators who expressed opinions on the subject, whether they spoke in favor of or against the amendment, and whether the stamp was omitted through neglect, mistake, or inadvertence.

To obviate this harsh result, Senator Hendricks of Indiana offered a further amendment, so much of which as is necessary for the purposes of the argument is in the following words:

" Unless subsequently duly stamped, which may be done by the holder or other person interested therein, if the proper party refuses or is unable to do so."

The amendment of Mr. Hendricks was debated by himself and Senators Fessenden and Reverdy Johnson, and they all again admitted that without the amendment of Hendricks, the effect of Mr. Fessenden's amendment would be to invalidate all instruments not properly stamped, irrespective of the inquiry or question whether the stamp was omitted innocently or negligently, or with intent to defraud the revenue.

The amendment of Senator Hendricks was rejected, and upon motion of Senator Collamer, the following proviso was annexed to the section:

" *Provided,* That the title of a purchaser of land by a deed duly stamped shall not be defeated or affected by the want of a proper stamp on any deed conveying said land by any person from, through or under whom his grantor claims or holds title."

In this shape, and with this understanding of its effect by Senators, so far as we have any evidence, the section under consideration (section 158) passed the Senate; and in the identical words incorporated therein by the Senate we find it a law approved.

Thus far, then, the opinions of the law-makers furnish a key to a correct interpretation, which is but another word to express their intention, respecting this particular enactment. Yet, as we have before said, these considerations, though necessarily of weight in reaching an enlightened judgment, ought not, and will not, control the Court, if the express terms of the Act explicitly declare a

Maynard *v.* Johnson.

different meaning or conclusion from that which these Senatorial · opinions indicate.

In our former opinion we interpreted the words "such instruments" as meaning instruments left unstamped with intent to evade the provisions of the law. Though we make no pretensions of being formidable grammarians, we do not hesitate to say that, in view of the arrangement and connection of the clauses of the section particularly under review, and the terms employed, the words "such instrument" may be held to relate to instruments left unstamped with a fraudulent intent. The former opinion hinged upon that construction, and that, too, we repeat, without any strain of the language used. But upon further assiduous examination and reflection, we incline to the belief that the Court erred. That such interpretation, though supported by grammatical rules, was too narrow and restrictive, and was calculated to defeat, in a great measure, the object of the law as being opposed to the express intention of the framers. The law was designed to raise revenue to support the Government and pay the interest on the public debt. This, incontrovertibly, was its main object and use. This object, it must be presumed, was ever present to the minds of the members of Congress, and imparted color and direction to their deliberations and actions while they had the subject matter under advisement. The exigencies of the times, as is a matter of historical and painful recollection to all good citizens, required that the contributions of all who claimed the protection of the Government should be as bounteous as their means would justify and the necessities of the national exchequer would demand. The Congress of the United States, if actuated by a throb of patriotic emotion, which is not questionable, could not be, was not indifferent to this condition of affairs. Impressed by these influences and considerations, they passed the law, from the bowels of which we seek to eviscerate its meaning. *Evisceribus actus.* What is its true meaning? By applying the words "such instrument" to those instruments from which are evasively or fraudulently omitted the required stamps, you leave all dependent upon the recovery of the penalty of two hundred dollars. But it must be a fact patent to all reflecting minds that no penalty regarding revenue stamp duties will protect the revenue. Nobody is interested to enforce the penalty, and in

one case in one hundred where an infraction of the law was committed the penalty would not be recovered. Suppose the law were that the instrument could not be used (sued upon, if you please) until stamped, let us consider how many thousands of instruments that require a revenue stamp would never come into a Court of justice. To this extent the revenue is lost. The oldest lawyer, perhaps, has not had two suits upon bank checks, yet they are drawn by tens of thousands daily. So of notes.

Suppose the penalty alone was enforceable, who shall determine the question of fraudulent intent? How can it be proved? How or when shall it be determined? How many cases of the kind will ever be tried? But, again, if the instrument should pass unstamped through the hands of several parties, who of them or how many of them shall you sue to recover the penalty? Shall it be one, or two, or more penalties, commensurate with the numbers of persons through whose hands the instrument has commercially passed? In fact, this amendment of Senator Fessenden was inserted *ex industria* from abundance of caution, to secure a larger revenue ; and there is no hardship in it, after all. Every man is bound to know the law in other matters as well as in this. Its object was to stimulate vigilance and attention, and thereby increase the revenue. Without it, the amount of revenue from that source would be nominal. With it, millions would flow into the National Treasury. In short, the construction placed upon the Act by appellant's counsel would effectually defeat the object of the law.

But we proceed to a closer scrutiny of the language of the Statute, and to a comparison of its several parts, to see if we cannot find in its very terms a meaning corresponding with the opinions of Senators, and with the views foreshadowed in the language above expressed.

Section 158 will warrant the following interpretation. It contains three propositions :

*The first,* that which it transported in its passage from the House into the Senate, to wit: That the penalty only should be visited upon the omission to attach the stamp to the instrument, document, or paper.

*Secondly,* an independent proposition, to wit: The amendment of

Mr. Fessenden, superadded to the penalty, for the more certainly securing the greater revenue.

*Thirdly*, the proviso of Senator Collamer.

Speaking for myself, I am inclined to the belief that, without the amendment of Senator Fessenden, all such instruments as are described in section 158, if unstamped, would be void, if the intent to defeat the provisions of the Act were proved, and there was no saving clause in the Statute to obviate that result. And this from the fact that such an instrument stands in antagonism to the policy of public law. But I express no decided opinion upon this point, because I have not taken time to examine it, and I do not deem it necessary to the decision of the case before the Court. The words " such instruments " I hold may relate, and in this instance do relate, to all instruments not stamped, mentioned in the section, no matter from what cause the stamp may have been omitted. This construction harmonizes not only with the understanding of the lawmakers, but also with the proviso of Senator Collamer, and with other sections of the Act. The proviso of Mr. Collamer was intended to save an innocent *bona fide* grantee, who had himself personally complied with the law. To make " assurance doubly sure," the honorable Senator intended that the innocent grantee should not be divested of his title because of the fraud or delinquency of any one of his predecessors in the course of transferring the title. But if all unstamped instruments were not intended to be held void, the proviso would seem to be unnecessary. For I hold that a man is not chargeable with the consequences of a fraud unless he participates in some way in its concoction or perpetration.

But let us refer to other sections of the Statute, because we are bound, in expounding a statute, to give every part of it effect, if possible, and to construe one part of the legislative enactment by the light we derive from other parts.

In section 152 of the Act under consideration, it is made unlawful to record any instrument, document, or paper required by law to be stamped, unless a stamp of the proper amount shall be affixed. And the *record* of such instrument not having the proper stamp or stamps, shall be utterly void, and shall not be used in evidence.

Again, section 153 of the same Act ordains : " That no instrument, document, writing or paper of any description, required by

law to be stamped, shall be deemed or held invalid and of no effect for the want of the particular kind or description of stamp designated for and denoting the duty charged on any such instrument, document, writing, or paper ; provided, a legal stamp or stamps denoting a duty of equal amount, shall have been duly affixed and used thereon." There is a proviso we need not quote.

After reading these sections of the Act, independently of the views and opinions of the legislators heretofore stated, can it be reasonably claimed that this law does not make all instruments described in it void unless legally stamped, or unless, as provided for in section 153, they bear a stamp denoting a duty of equal amount to the stamp specifically prescribed for use on each particular instrument? If so, the sections contradict one the other. Take it that all the instruments mentioned in section 158, if unstamped, are invalid, and these sections are in perfect harmony and unison. Why shall the *record* of an instrument be held " utterly void," as declared in section 152, if the instrument be unstamped, and the instrument itself not be equally void ? Why shall an unstamped instrument " be held invalid and of no effect," as denounced in section 153, if the same instrument be held valid under section 158 of the same Act, as contended for by the appellant's counsel ? Such a construction would make the statute incongruous and contradictory.

Again, the Act was not to take effect until the first day of August following. This was certainly intended to apprise parties, to familiarize the public with the law, so that they may guard against its operation and effect. Furthermore, the Act saved all unstamped instruments previously executed and delivered, as will be seen by reference to section 163. That section, among other things, contains the following proviso : " That no instrument, document, or paper, made, signed, or issued prior to the passage of this Act, without being duly stamped, or having thereon an adhesive stamp or stamps to denote the duty imposed thereon, shall for that cause, if the stamp or stamps required shall be subsequently affixed, be deemed invalid and of no effect."

We think the inference legitimately deducible from this legislation is, that Congress intended that all unstamped instruments executed after the Act of 1864 should take effect, no matter with what intent, or from what cause, the legal and requisite stamp or stamps may

have been omitted, should be invalid and of no effect.   Hence, we conclude that the Act upon its face manifestly indicates the intention of its framers.

There seems to be no question that the Congress of 1865 understood the Act of 1864 as we now read it.   On the third day of March, 1865, an Act was passed amendatory of the Act of June 30, 1864.   The Act of 1865 amended section 158 of the law of 1864 so as to reduce the penalty to fifty dollars, and annexed to section 158 provisos by which unstamped instruments may be made valid.   This is forcible evidence of the fact that the Congress of 1865 understood the Act of 1864, as Senator Fessenden and his associate Senators understood it, namely : that it annulled all instruments not legally stamped made during the time the Act was in force. Vide Act of Congress passed March 3d, 1865, section 158.   And we are authorized to resort to this subsequent legislation as one of the means outside of the statute to arrive at its true intent and meaning. If it can be gathered from a subsequent statute, *in pari materia*, what meaning the Legislature attached to the words of a former statute, this will amount to a legislative declaration of its meaning, and is entitled to great weight in the construction of the first statute. *Morris* v. *Mellin*, 6 Barn. and C. 446 *et seq*.

Finally, though there may be doubt as to the meaning and application of some word or clause in a statute, yet if the intention of its framers be apparent, that intention must control the construction of the Act.   Under this rule it results that statutes are very often construed against their letter ; that words are sometimes expunged, other words supplied, to carry out the object of the law.   The books teem with instances of this character.   We hold the following propositions to be well-settled and established law :

Where the words of a statute are obscure or doubtful, the intention of the Legislature is to be resorted to in order to discover their meaning.·   A thing within the intention is as much within the statute as if it were within the letter ; and a thing within the letter is not within the statute if contrary to the intention of it.

So, again, such construction ought to be given as will not suffer the statute to be eluded.   *People ex rel. etc.* v. *U. Ins. Co.*, 15 J. R. 358, 380 ; 3 Cow. R. 89 ; 21 Wend. 211 ; 13 Mass. 518 ; 8 Pick. 516 ; *Henry* v. *Tilson*, 17 Ver. 479.

After an earnest effort to reach the truth, and, therefore, a just judgment in this case, in view of the terms of the statute under examination, as well as the manifest object of it, and the legal rules established for the interpretation of laws, we have become satisfied that the Court reached an erroneous conclusion in its former opinion. Having thus determined, though exceedingly reluctant to declare the instruments set out in the complaint void under the law, we cannot hesitate to reverse our former ruling in obedience to our clear conviction.

Our first decision is accordingly set aside, and the judgment of the District Court will stand affirmed.