BOARD OF COUNTY COMMISSIONERS OF THE COUNTY OF CLARK; DAVID CANTER, ROBERT BROADBENT, MANUEL CORTEZ, JACK PETITTI, RICHARD RONZONE, WOODROW WILSON AND THALIA DONDERO, AS THE MEMBERS OF SAID BOARD; PLANNING COMMISSION OF THE COUNTY OF CLARK; JACK ROSS, ROBERT GEORGESON, ARTORO CAMBEIRO, RICHARD DAVIS, DIANE DIXON, TEX KING AND RAY E. WILLIS, AS MEMBERS OF SAID COMMISSION; AND ROBERT WEBER, BUILDING INSPECTOR OF CLARK COUNTY, APPELLANTS, *v.* CMC OF NEVADA, INC., A NEVADA CORPORATION, AND CHARTER MEDICAL CORPORATION, A DELAWARE CORPORATION, RESPONDENTS.

No. 13491

October 13, 1983 670 P.2d 102

[Rehearing denied December 20, 1983]

*Robert J. Miller,* District Attorney, *John F. Whisenhunt,* and *Stanley W. Parry,* Deputy District Attorneys, Clark County, for Appellants.

*Beckley, Singleton, DeLanoy & Jemison,* Las Vegas, for Respondents.

## OPINION

By the Court, Steffen, J.:

Appellants seek relief from the district court's order mandating appellants' approval of respondents' application for architectural supervision and issuance of a building permit. We conclude that the district court erred in granting mandamus and therefore reverse.

Respondent CMC of Nevada, Inc. (CMC) is the owner of certain real property situated adjacent to the Desert Springs Hospital in Clark County, Nevada. On April 13, 1979, CMC applied for a C-P zoning change on the subject property for the purpose of constructing "parking lot facilities." Thereafter, on June 5, 1979, appellant Clark County Board of Commissioners (Board) approved the requested zone change. Two months later, respondents applied to the Clark County Planning Commission (Commission) for a conditional use permit and variance to construct and maintain, within 5 feet of the side property line, an 80 bed psychiatric hospital on the property which had been previously zoned C-P. On October 2, 1979, the Board followed the recommendation of the Commission and approved the applications for a conditional use permit and variance. The variance was modified, however, so as to require a minimum setback of 15 feet from the side property line.

The public notice for the use permit and variance described the proposed facility merely as a hospital, not a psychiatric hospital.

Prior to obtaining a building permit, CMC applied for architectural supervision.[1] The application was filed on October 20, 1980, in furtherance of the use permit and variance previously granted. On November 20, 1980, after public notice, the matter of architectural supervision came before the Commission in a

---

[1]The parties concede the proposition that architectural supervision is required. In any event, the Commission or its designated representative may impose an architectural supervision requirement in order to promote the purposes of the zoning laws. 29.52.010(c).

public hearing.[2] The hearing resulted in a refusal to approve CMC's plans, assertedly due to an inadequate setback or "buffer" between the proposed project and an adjacent elementary school.[3] The Board unanimously concurred with the action and recommendation of the Commission on January 20, 1981. As a result of the foregoing action, the Clark County building inspector refused to issue the building permit which was requisite to the commencement of construction of the psychiatric hospital.

On the assumption that the Board's approval of the conditional use permit and variance would enable them to proceed, respondents expended in excess of $120,000 and entered into construction commitments of over $2,000,000 in furtherance of the proposed project.[4]

Respondents sought to break the impasse by filing suit and requesting mandamus to force County authorities to favorably act upon CMC's application for architectural supervision and to require the County to issue a building permit. The district court held that the Commission's discretion under the architectural supervision ordinance, Chapter 29.52 (Ordinance), was limited to considerations which were of an "aesthetic or appearance" nature and that the action of the Board and Commission in refusing to approve CMC's plans was arbitrary, capricious and an abuse of discretion. The district court then ordered that a peremptory writ of mandate issue requiring the County to "grant" CMC's application for architectural supervision and to issue a building permit.

Appellants claim entitlement to relief on the primary contention that the lower court was unduly restrictive in its construction of the county ordinance respecting architectural

[2]The public notice given in connection with this hearing disclosed for the first time the fact that the proposed facility was a psychiatric hospital. The result was a solid storm of protest from various groups and residents who opposed construction of the hospital immediately adjacent to an elementary school and residential neighborhood. Although the County failed to disclose the psychiatric aspect of the facility in its public notice for a use permit and variance, the parties have concluded that adequacy of public notice is not an issue in this appeal.

[3]Counsel for appellants conceded at oral argument that it may be fairly inferred from the record that the purpose for imposing an expanded setback on the project was to assure its demise.

[4]Actually, the record reflects that CMC contractually reserved the right to rescind the $2,528,000 construction contract in the event it was unable to obtain proper zoning, a building permit or any other necessary governmental approval. In such event, CMC's obligation to the contractor was not to exceed an amount covering reimbursement for actual expenses of performance under the contract plus 6 percent of those actual expenses. We were informed during oral argument that construction has not commenced on the project.

supervision. We are asked to construe the language of the Ordinance to permit the imposition of non-aesthetic requirements, such as an enlarged buffer zone, thus entitling the Commission and the Board to impose substantive modifications to plans and specifications which are approved in the course of granting a zone change, use permit or variance.

The scope and effect of the Ordinance are threshold issues on appeal. If we were to accept the limited construction of the district court, respondents' right to proceed with the project would be apparent. It is conceded that the Commission found no problems with the appearance of the planned facility. Thus, in undertaking architectural supervision, if the Commission's function under the Ordinance is confined to project aesthetics, CMC should have received the necessary plan approval.

We do not agree with the district court's conclusion. In our view, the Ordinance was not enacted to merely provide perfunctory review and endorsement of plans previously submitted in support of a conditional use permit request. First, we observe that the Commission may require architectural supervision in any given instance irrespective of the substantial conformity of the plans to those submitted and approved in connection with the granting of a conditional use permit. Section 29.52.010(c). This grant of discretion in the Commission is provided in order to promote the purposes of the zoning title in accordance with Section 29.01.020. The latter section specifies that the purpose of the title is to promote "the health, safety, morals or general welfare of the present and future inhabitants of Clark County. . . ." It further indicates, in part, that the title is designed "to ensure that the development of land is commensurate with the character and the physical limitations of the land", "to take into account . . . the relative suitability of such land for such development" and "to promote health and the general welfare." Further, the referenced general purpose section of title 29 reflects consideration in its enactment for "encouraging the most appropriate use of land throughout Clark County."

The Commission could hardly function in effective promotion of the recited purposes of the zoning title if it were restricted solely to considerations of aesthetics. We must conclude that subsection (c) of the Ordinance validly recognizes authority and discretion in the Commission to require whatever measures are necessary to satisfy the concerns which prompted an imposition of architectural supervision.

Respondents nevertheless contend, and the district court agreed, that the following language of the Ordinance makes clear its narrow purview:

> The planning commission shall consider these drawings, plans and sketches in an endeavor to provide that such buildings, structures and other improvements shall be designed and constructed so that they will not become *unsightly, undesirable* or *obnoxious in appearance* to the extent that they will hinder the orderly and harmonious development of the county, limit the opportunity to attain the optimum use and value of land and improvements, impair the desirability of living conditions in the same area or adjacent agricultural or residential areas, or otherwise adversely affect the general prosperity or welfare. (Emphasis supplied.)

It is argued, as held by the lower court, that the words "unsightly", "undesirable" and "obnoxious" are all modified or defined by the prepositional phrase "in appearance". Such a construction would supply redundancy to the word "unsightly". It would likewise deprive the term "undesirable" of meaningful import since it would be merely repetitive of the term "unsightly", and thus also redundant. The term "obnoxious", however, invited modification since it may connote in general, an offensive, disgusting, reprehensible, harmful, odious or objectionable nature which, unless so modified, may potentially cast County action approving a conditional use permit in a position of obloquy. *See* Webster's Third New International Dictionary.

 ██

Courts must construe statutes and ordinances to give meaning to all of their parts and language. State *ex rel*. List v. AAA Auto Leasing, 93 Nev. 483, 568 P.2d 1230 (1977), Nevada State Personnel Division v. Hashins, 90 Nev. 425, 529 P.2d 795 (1974). The court should read each sentence, phrase, and word to render it meaningful within the context of the purpose of the legislation. *See* State Gen. Obligation Bond v. Koontz, 84 Nev. 130, 437 P.2d 72 (1968). A reading of legislation which would render any part thereof redundant or meaningless, where that part may be given a separate substantive interpretation, should be avoided.

 ██

Our review of the Ordinance in question reveals that the district court's construction unnecessarily renders the word "undesirable" meaningless, at the expense of a reading which would render the language significant within the context of the stated policy of promotion of the public safety, health and welfare. We find such an interpretation unacceptable and hold that

the prepositional phrase "in appearance" modifies only the term "obnoxious".

The above construction of the Ordinance will subserve the purposes of its enactment, thereby allowing the Commission to provide meaningful assurance that the public health, safety and welfare will be promoted, and that land will be accorded its most appropriate use. Such a construction will also give effect to the unquoted part of the Ordinance quoted above:

> To this end the planning Commission shall suggest any changes in the plans of such proposed buildings, structures and other improvements which it may deem necessary to accomplish the purposes of this chapter, and may refuse to approve any such plans until it is satisfied that such purposes will be accomplished thereby.

Our construction of the Ordinance is also supported by the amendment to the Ordinance enacted subsequent to the action in question.

When a former statute is amended, or a doubtful interpretation is rendered certain by subsequent legislation, the amendment is persuasive evidence of the purpose and intent of the legislature in passing the former (unamended) statute. *See* Woofter v. O'Donnell, 91 Nev. 756, 542 P.2d 1396 (1975); Sheriff v. Smith, 91 Nev. 729, 542 P.2d 440 (1975).

Here, the Ordinance was modified to read as follows:

> The planning commission shall consider these drawings, plans and sketches in an endeavor to provide that the design of such buildings, structures and other improvements shall be adequate to prevent them or the uses for which they are to be utilized from being *unsightly, undesirable or obnoxious* to the extent that they will hinder the orderly and harmonious development of the county, limit the opportunity to attain the optimum use and value of land and improvements, impair the desirability of living conditions in the same area or adjacent areas, or otherwise adversely affect the general prosperity or welfare. To this end, the planning commission may require any changes in the plans of such proposed buildings, structures and other improvements which it deems necessary to accomplish the purposes of this chapter, and may refuse to approve any such plans until it is satisfied that such purposes will be accomplished thereby. *As a prerequisite to approval of any application for architectural supervision, the planning commission may impose any condition, including but not*

*limited to flood control, additional setbacks, off-site improvements, landscaping, street dedication, wall enclosures, noise circulation, that it deems necessary to accomplish the purposes of this chapter.* (Emphasis added.)

The deletion of the words "in appearance" after the word "obnoxious" indicates that architectural supervision is intended to go beyond review of the merely aesthetic aspects of a project, and extends to evaluation of a project design within the context of public health, safety, and welfare considerations. That the amended Ordinance details conditions which may be imposed by the Commission prior to approval of an application for architectural supervision also supports our construction that the Ordinance provides substantive powers to the Commission at the architectural supervision stage.

We are equally unpersuaded by respondents' characterization of "absurdity" to a statutory scheme which would ostensibly enable the Commission and Board to disapprove under architectural supervision a project which both bodies approved at the conditional use permit and variance hearings. First, we do not ascribe to the Ordinance a plenary function regarding project acceptability. It is one thing to impose conditions necessary to the satisfaction of title 29 purposes; it is quite another to rescind the prior final action of the Commission and Board granting life to the project.

We are not offended by the possibility of duplicative considerations. Architectural supervision may act as an added precaution or "failsafe" system to assure proper deference to the general welfare purposes of title 29. For example, at the hearings regarding the conditional use permit and variance, both the Commission and Board failed to focus on the special public concerns pertaining to the introduction of a psychiatric care facility in the immediate vicinity of an elementary school and residential neighborhood. The public within the noticed area of the intended project were apparently unaroused by the public notice concerning these hearings because it described the project only as a hospital. Since respondents also own the general care hospital, Desert Springs, situated adjacent to the proposed project, it is apparent that interested and affected members of the public incorrectly assumed that the Desert Springs general care hospital was simply being enlarged. When the project was fully described as a psychiatric hospital in the public notice pertaining to architectural supervision, many organizations and individuals appeared to voice their concerns. As a result, the Commission, sitting in its capacity under the Ordinance, was able to focus in substantial detail on matters pertaining to the

purposes of title 29 and the Ordinance in relation to the pending project. The Commission, armed with further enlightenment and insight, was then in a position and indeed, under a duty, to exercise its discretion to assure that the project conformed, at least to the highest possible extent, with the purposes of title 29 and the Ordinance.

In view of our construction of the Ordinance, it is clear that the Commission's function thereunder contemplates a substantial exercise of discretion. This, in turn, is dispositive of respondents' attempt to sustain the district court's conclusion of law that respondents enjoyed a vested right to construct and operate a psychiatric hospital. Although certain inroads are appearing in the general rule that vested rights against changes in the zoning laws exist only after the issuance of a building permit and the commencement of construction, such inroads do not confer vested rights unless zoning or use approvals are not subject to further governmental discretionary actions affecting project commencement. *See* Tosh v. California Coastal Commission, 99 Cal.App.3d 388, 160 Cal.Rptr. 170 (1979); South Central, etc. v. Charles A. Pratt Const., 128 Cal.App.3d 830, 180 Cal.Rptr. 555 (1982). *See also* Town of Paradise Valley v. Gulf Leisure Corporation, 557 P.2d 532 (Ariz. 1976); Gosselin v. City of Nashua, 321 A.2d 593 (N.H. 1974).

Since the Ordinance contemplates the exercise of substantial discretion by the Commission in the execution of its functions, it is apparent, and we so hold, that respondents do not have vested rights under any of the case authorities.[5]

Finally, the district court determined that county authorities acted arbitrarily, capriciously and in abuse of their discretion in refusing to approve respondents' plans during the hearings on architectural supervision. On the record before us, we must agree.

The project plans submitted by respondents for approval

---

[5]Although the vested rights doctrine is basically an application of equitable estoppel, it is commonly invoked as a means of avoiding changes in the zoning laws occurring after final approvals are granted or permits issued by a governmental body. Here, the district court concluded as a matter of law that respondents enjoyed a vested right to construct and operate the psychiatric hospital. The lower court's conclusion was not applicable to a change in any of the zoning laws since no such changes were then asserted as a basis for requiring substantive modifications in the project. We are, nonetheless, approaching the issue of vested rights as if it were raised in the traditional sense. In any event, for the reasons stated, we have concluded that respondents do not have a vested rights status.

during the hearing on architectural supervision were substantially identical to those approved when the conditional use permit was granted. Therefore, substantive modifications or changes imposed as a condition to project approval at the architectural supervision stage must have been supported by evidence and cogent reasons consonant with the purposes of the ordinance. It appears from the record that the requisite support is lacking.

The record suggests, as did counsel for appellants during oral argument, that the expanded setback requirement was arbitrarily imposed in order to kill the project. If so, such an imposition constituted a clear abuse of discretion by county authorities. As indicated previously, the Ordinance contemplates a governmental function beyond mere aesthetics but short of the ultimate authority to rescind prior approvals by the Commission and Board. An attempt to frustrate a project by imposing unsupported changes of a magnitude which would assure such a result is tantamount to a rescission of prior project approvals. We are not suggesting, however, that substantive changes may not be required at the architectural supervision stage. When such changes are imposed, they must be supported by evidence and cogent reasons.

Since evidence and cogent reasons were substantially absent in requiring a vastly expanded setback of undetermined dimension as opposed to the 15-foot setback approved with the conditional use permit, we have concluded that such a requirement was arbitrary and constituted an abuse of discretion.

Upon remand, if CMC desires to resubmit its application for architectural supervision, we will assume that the county will perform its function within the letter and spirit of the laws under which it must operate. This means that any substantive changes imposed by the county during the architectural supervision stage of CMC's project must be supported as indicated above.

The district court issued a writ of mandamus essentially compelling the county to forego meaningful architectural supervision and to issue a building permit allowing CMC to proceed with the construction of the project under its present plans and specifications. This was error. Since respondents' rights are not vested, and in view of the substantive purpose of the Ordinance, it is essential that county authorities be permitted to pursue their expected functions under the Ordinance.

Under the circumstances of this case, mandamus is not

appropriate, and the writ must be vacated. *See* State *ex rel.* Lawton v. Public Service Commission, 44 Nev. 102, 190 P. 284 (1920). We remand the matter to the appropriate county authorities who, upon resubmission of an application for architectural supervision by respondents, are expected to entertain such application in accordance with this opinion.[6]

Other issues raised on appeal have been considered and deemed to be without merit in light of our disposition of this appeal.

The district court order granting the writ of mandamus is hereby reversed and the case remanded for proceedings consistent with this opinion.

MANOUKIAN, C. J., and MOWBRAY J., concur.

SPRINGER, J., with whom GUNDERSON, J., joins, dissenting:

The question in this case is whether or not a requirement of architectural approval in the Clark County building ordinance can be invoked to frustrate an approved building project on other than aesthetic grounds. I agree with the trial court that it cannot and would affirm the trial court's judgment. I therefore dissent.

Respondent, CMC, desired to construct and operate a psychiatric hospital on certain real property located adjacent to a general care hospital, the Desert Springs Hospital, in Clark County, Nevada. Both the Desert Springs Hospital and the real property upon which the psychiatric hospital was to be built are owned by CMC and located within the vicinity of a residential neighborhood and elementary school.

On April 13, 1979, CMC applied for a C-P zoning change on the subject property for the purpose of constructing "parking lot facilities."[1] The Clark County Board of Commissioners (Board) approved the requested change on June 5, 1979. On August 3, 1979 CMC applied to the Clark County Planning Commission (Commission) for a conditional use permit and variance in order to construct and maintain an 80-bed psychiatric hospital on the property which had previously been rezoned C-P. The hospital was to be located within five feet of the side property lines.

Public notice for the use permit and zoning variance described the proposed facility merely as a "hospital," not a

___

[6]We do not intend, by this opinion, to convey any attitude or inference regarding the ultimate disposition of respondents' project.

[1]The C-P district is zoned primarily for office and professional uses. Clark County Code 29.25.

psychiatric hospital.[2] On October 2, 1979 the Board followed the recommendation of the Commission and approved the conditional use permit, as well as the zoning variance. In doing so, the Board modified the variance so as to require a minimum setback of 15 feet from the side line property. Thereafter, CMC spent $120,000.00 on the project and made financial commitments in excess of $2,000,000.00.

On November 20, 1980, CMC came before the county planning commission seeking architectural approval[3] of the building plans as a condition of issuance of its building permit. The planning commission denied CMC's application for architectural supervision "because there is not the proper buffer between this zone and the zones adjacent to it."[4] On January 20, 1981, the Board, following the recommendation of the Commission, denied the application for architectural supervision by a unanimous vote. As a result of this denial the Clark County building inspector refused to issue CMC a building permit.

CMC filed the present action on February 13, 1981, request-

---

[2]Although the application for a conditional use permit before the Clark County Planning Commission merely referred to the proposed project as a "hospital," the application for a variance, submitted to the Commission at the same time, referred to the proposed facility as a "psychiatric hospital."

[3]Clark County Code, Chapter 29.52 requires that the planning commission approve architectural plans in certain cases before a permit for construction is issued. In reviewing the plans from an architectural standpoint the planning commission is required to

> endeavor to provide that such buildings . . . shall be designed and constructed so that they will not become unsightly, undesirable or obnoxious *in appearance* to the extent that they will hinder the orderly and harmonious development of the county, limit the opportunity to attain the optimum use and value of land and improvements, impair the desirability of living conditions in the same area or adjacent agricultural or residential areas, or otherwise adversely affect the general prosperity or welfare. (Emphasis added.)

[4]It is quite apparent from the record that denial of architectural approval because there was no "proper buffer" was an ill-disguised attempt to frustrate a previously approved construction project. Thirty-nine persons appeared at the hearing to oppose the application, and the vice-chairman of the board remarked at the time that it should not have been approved in the first place and that there was "no sense in rehashing fault." The board was later advised by its counsel that it was "tenuous indeed to argue . . . that imposition of a buffer area is warranted on the basis of [the language in the architectural approval section], yet was unwarranted when the variance application was granted." It was also advised by counsel that "imposition of a buffer at this time would not only appear to be inconsistent with prior action but would also support an argument of reliance on prior action of the County on the part of CMC." At oral argument counsel for appellants conceded that it may be fairly inferred from the record that the purpose for imposing an expanded setback on the project was to assure its ultimate demise.

ing a writ of mandamus commanding the county to grant CMC's application for architectural supervision and a building permit.

On June 25, 1981, the district court ruled that CMC's application for architectural supervision had been improperly denied. The court below found that

> the record of the hearings before the County Commissions contained no substantial evidence that the buildings, structures and other improvements shown in and contemplated by the plans, data and information submitted to the county with said application for architectural supervision, will be or become unsightly, undesirable or obnoxious in appearance, as those terms are used in the context of said Chapter 29.52, or be or become incompatible with the surrounding neighborhood.

On July 2, 1981, a writ of mandamus was issued together with the district court's Findings of Fact and Conclusions of Law.

This appeal followed.

The heart of this controversy centers around the construction that is to be given to Chapter 29.52 of the Clark County Code in determining the factors upon which the planning commission may consider in granting or denying architectural supervision. In its interpretation of the ordinance the court must look to the entire sentence and construe each clause in light of the purpose of the whole. State General Obligation Bond v. Koontz, 84 Nev. 130, 437 P.2d 72 (1968). The purpose of a statute is to be gathered from the whole act. Alexander v. Cosden Pipe Line Co., 290 U.S. 484 (1933). Resort may be had, not only to the context, but to the structure and scheme of the act. United States v. Cooper Corp., 312 U.S. 600 (1941).

It is apparent when viewing Chapter 29 of the Clark County Code that the criteria established for architectural supervision under 29.52 are limited to aesthetic and appearance considerations and are distinct from those factors which relate to the use of a proposed development or how a proposed use will affect the surrounding vicinity.

If a landowner seeks to obtain a conditional use permit or zoning variance pursuant to Chapter 29.66, that landowner must submit with his application certain plans which describe in detail his intended use and development of the property.[5]

---

[5]Chapter 29.66.010(a) provides in pertinent part:

> The application for a conditional use permit or variance permit as provided herein . . . shall be accompanied by the following data and information.
>
> . . . .
>
> (1) Site development plan, drawn to scale to include building

These plans and specifications are virtually identical to those required for submission with an application for architectural supervision. Considerations such as flood control, noise control, traffic congestion, public safety and the like are factors which inevitably are taken into account when determining whether a proposed project should be approved in light of the surrounding neighborhood scheme. When an application is submitted for a zoning variance or conditional use permit, the Board may qualify the approval with whatever safeguards the Commission may deem necessary to protect neighboring properties. Under Chapter 29.66.010(g):

> The board of county commissioners in granting the permits may establish conditions under which the lot or parcel of land may be used, or a building or structure is constructed or altered, or make requirements as to architecture, height of a building or structure, open spaces, parking areas or vehicle storage and conditions of operation of any enterprise, *or may make any other condition, requirements or safeguards that the commission may consider necessary to prevent damages or prejudice to adjacent properties* or detriment to the county and to secure substantially the objectives of the regulation or provision to which conditional use permit, variance or adjustment is requested and will provide adequately for the maintenance of the integrity and character of the district in which located. When deemed necessary, the board of county commissioners may require guarantees in such form as it may deem proper under the circumstances, to insure that the conditions designated in connection therewith are being or will be complied with. (Emphasis supplied.)

In the present controversy, CMC submitted virtually identical plans, data, and information with its application for architectural supervision as it did with its applications for a conditional use permit and zoning variance.

By modifying such plans and specifications only in respect to

dimensions of existing and proposed structures; *setback dimensions;* yards and open space dimensions; parking space dimensions; location of signs; location of landscaping; and such other information as may be necessary;

(2) Floor plan, drawn to scale to indicate size of buildings and total square footage of buildings;

(3) Rendered elevation to indicate the architectural appearance of proposed buildings;

. . . .

(Emphasis added.)

the 15-foot minimum setback, the Board necessarily approved the development of the subject property for use as a psychiatric hospital. Accordingly, by granting the variance in 1979, the county must have implicitly made a finding to the effect that a hospital built with a 15-foot setback would not materially or adversely affect the health and safety of persons in the community, injure the property of the surrounding neighborhood, or detrimentally affect the public welfare. Such an approval is final as to the intended use. Clark County Code, Chapter 29.66.010(h).

Despite the prior approval, the Board denied CMC's application for architectural supervision for lack of "a proper buffer" zone around the hospital. Imposition of the buffer zone made it impossible to proceed with construction under the approval granted on October 7, 1979. The question is whether denial of architectural approval can be used to frustrate a previously approved project. The answer is that the architectural approval chapter is intended only to place a limitation on aesthetic qualities of the planned construction when there is a finding that the architectural design will be "unsightly, undesirable, or obnoxious" to such a degree as to "limit the optimum value of the land, impair the desirability of living conditions or otherwise affect the general prosperity or welfare." No such finding was made nor could be made by the planning commission.

In summation, it would appear that Chapters 29.66 and 29.52 of the ordinance relate to different aspects of the zoning and planning procedures. Under Chapter 29.66 the county may grant a right to make special use of the property and it may require setback conditions, as was done in this instance. Under Chapter 29.52 the county must grant an application for architectural supervision based upon the "appearance" of the structure *provided* the plans are in substantial conformity with those previously approved and the proposed architectural design is not "unsightly, undesirable, or obnoxious" in appearance.

That a previously approved project cannot be invalidated by a subsequent denial of architectural approval on non-aesthetic grounds is made clear by a reading of the ordinance. The judgment of the trial court should be affirmed.